

**UNITED STATES DISTRICT COURT**

**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LOIS KATZIFF, DAVID RICHARDS, and CAROLYN SHAPIRO, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>        vs.<br><br>BEVERLY ENTERPRISE, INC., a Delaware corporation, GOLDEN GATE NATIONAL SENIOR CARE ADMINISTRATIVE SERVICES, LLC, BEVERLY ENTERPRISES, INC. 401(K) SAVINGSPLUS PLAN INVESTMENT COMMITTEE, and MICHAEL KARICHER, LARRY DEANS, JOHN ARENA, PAMELA DANIELS, RICHARD SKELLY, DANA SAULS, MATTHEW MACGREGOR, DARREN BURGESS, TERRI BURT, ELIZABETH OGDON, AMY BRANTLEY, NORMAN MICHAEL MORTON, and ANN TRUITT<br><br>        Defendants. | Civil Action No. 07-11456<br>_____<br><br>CLASS ACTION<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND PROHIBITED TRANSACTIONS**<br><br>**Jury Trial Demanded** |

Plaintiffs Lois Katziff, David Richards, and Carolyn Shapiro (collectively, the "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this action under the Employee Retirement Income Security Act ("ERISA") on behalf of the Beverly 401(k) SavingsPlus Plan ("Plan"), seeking to recover all of the losses that Defendants Beverly Enterprises, Inc., a Delaware corporation, and its successor Golden Gate National Senior Care Administrative Services, LLC (collectively referred to as "Beverly" herein), the Beverly Investment Committee ("Investment Committee"), Michael Karicher, Larry Deans, John Arena, Pamela Daniels, Richard Skelly, and

Dana Sauls, Matthew MacGregor, Darren Burgess, Teri Burt, Elizabeth Ogdon, Amy Brantley, and Norman Michael Morton (collectively, the "Defendants") have caused to the Plan and allege:

## INTRODUCTION

1. Employees of Beverly set aside portions of their income every month and place it in the Plan with the goal that the returns on their investments will be sufficient to support them and their families when they retire. For many of these employees, the money in their 401(k) will be their only source of income after they retire.

2. The Plan is sponsored by Beverly. Beverly's Investment Committee and the individually-named defendants are and/or were the fiduciaries. Because they are entrusted with the Plan Members' retirement savings, Defendants owe Plan members the highest fiduciary duty known to law. This duty includes an obligation to safeguard Plan assets, to defray reasonable expenses, to prudently run the Plan, and to exercise the required skill, care, and diligence in administering the Plan and its assets so as to maximize returns for members.

3. Since at least 1996, Defendants have repeatedly breached their fiduciary duties to Plan members, causing their employees to lose millions and millions of dollars in retirement savings. By way of example:

- Defendants are responsible for making sure that Plan participants are provided with prudent investment options. Despite the ready availability of reasonably-priced investment options, especially for large plans that can leverage economies of scale, Defendants offered unreasonably expensive funds through its investment advisor and record keeper, Diversified Investment Advisors ("Diversified"). Diversified charged the Plan excessive fees for its services, while offering an inadequate mix of undiversified, imprudent investment choices that significantly underperformed their benchmarks;

- Defendants failed to adequately monitor Diversified and had no adequate mechanism for doing so for almost 10 years;

- Defendants failed to disclose significant charges incurred by the Plan to the Plan members;

CLASS ACTION COMPLAINT

- Defendants failed to disclose that investing in the Stable Value Fund, which was represented as the least risky investment option, actually created the risk of incurring a substantial "market value adjustment" penalty;

- Defendants failed to replace and/or negotiate better terms with Diversified, when they knew Diversified's fees were excessive;

- Defendants failed to disclose, in violation of applicable law, that Diversified was receiving substantial "revenue sharing" kickbacks from mutual funds that Diversified offered to Plan members as investments. These payments were a quid pro quo for Diversified offering the funds and not provided in exchange for actual services. Yet Defendants failed to stop this illicit practice;

- Defendants failed to pursue remedies against Diversified and Stephens Inc. ("Stephens"), for their improper use of Plan assets, excessive fees, and receipt of "revenue sharing" kickbacks in violation of ERISA; and

4. Even after Beverly's own consultant advised Beverly that Diversified's fees were "very high," and that the menu of investments offered by the Plan was inappropriate, Defendants continued to offer an inadequate menu of investments, caused the Plan to engage in prohibited transactions, refused to pursue any remedies against Stephens and Diversified, and failed to renegotiate the terms of the Plan's agreement with Diversified.

5. In July 2006, Defendants elected to change service providers. With no warning to Plan Members, the Plan incurred a "market value adjustment" penalty exceeding $2.3 million, as a result of the liquidation of the Stable Value Fund. Plan members, such as Plaintiffs, who were told that they were investing their retirement savings in the least risky option, incurred an unnecessary and substantial loss to their retirement savings. Defendants did not disclose the possibility of this penalty to Plan members, did not tell Plan members how to avoid it, and made no effort to avoid incurring it before deciding to liquidate the Stable Value Fund.

6. Moreover, the Stable Value Fund guaranteed a return of principal and accumulated interest to its investors. After Defendants caused the Plan to liquidate the Stable Value Fund, Defendants caused the Plan to "map" the assets that were in the Stable Value Fund to Fidelity

Freedom Funds.  Unlike the Stable Value Fund, the menu of Fidelity Freedom Funds selected by Defendants did not guarantee principal or accumulated interest, which exposed participants to significantly greater risk.  Defendants' imprudent gamble with Plaintiffs' retirement savings was made at the least opportune time given the prevailing economic environment.  As a result of this breach of fiduciary duty, Defendants caused the Plan to incur losses in excess of $10 million.

7.    On information and belief, the new service provider hired by Defendants, Fidelity Investments ("Fidelity"), has engaged in many of the same improper activities performed by Diversified, resulting in new, and continuing breaches of fiduciary duty by Defendants.  For example:

- Fidelity has charged, and continues to charge, the Plan excessive fees, many of which are concealed from Plan members;

- The investments offered by Fidelity have been untested and/or underperformed benchmarks;

- Fidelity receives illicit revenue sharing kickbacks;

- Defendants have done nothing to stop, and indeed have aided, all of this conduct.

8.    Many of the foregoing facts have only recently come to light through discovery in this case.  Despite their duty to provide full and accurate information to Plan members, Defendants and their agents have concealed these material facts from Plan members, and repeatedly refused to provide Plan members information.

## JURISDICTION AND VENUE

9.    This action for breach of fiduciary duty is brought pursuant to Section 502 of ERISA, 29 U.S.C. § 1132, and the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.

10.    Venue lies in the United States District Court for the District of Massachusetts pursuant to ERISA section 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was and continues to be administered in this district, the breaches took place and continue to take place in this district, or one or more of the Defendants resides or may be found in this district.

**PARTIES**

**A.    Plaintiffs**

11.    At all relevant times, Plaintiff Lois Katziff was and is an employee of Beverly Enterprises, Inc. ("Beverly") and a participant in the Beverly Enterprises, Inc. 401(k) SavingsPlus Plan ("Plan") sponsored by Beverly.  Ms. Katziff resides in Needham, Massachusetts.

12.    At all relevant times, Plaintiff David Richards was and is an employee of Beverly and a participant in the Plan sponsored by Beverly.  Mr. Richards resides in Wilmington, Massachusetts.

13.    At all relevant times, Plaintiff Carolyn Shapiro was an employee of Beverly and was a participant in the Plan sponsored by Beverly.  Ms. Shapiro resides in Auburndale, Massachusetts.

**B.    Defendants**

**1.    The Institutional Defendants**

14.    At all relevant times, Defendant Beverly was the Sponsor and Plan Administrator of the Plan.

15.    From January 1, 1998 through March 14, 2006, Defendant Beverly Enterprises, Inc. was the Plan Administrator for the Plan within the meaning of ERISA section 3(16)(A) [29 U.S.C. § 1002(16)(A)] and a fiduciary of the Plan within the meaning of ERISA section 3(21) [29 U.S.C. § 1002(21)(A)].

16.    On or about March 14, 2006, Defendant Golden Gate National Senior Care Administrative Services, LLC ("GGNSC") became the Plan Administrator and a fiduciary of the Plan within the meaning of ERISA § 3(21) [29 U.S.C. § 1002(21)(A)].

**2.    The Individual Defendants**

17.    Each of the following individuals is being sued in their individual capacities as fiduciaries during the times they served on the Investment Committee.

18.    At all relevant times, Defendant Michael Karicher ("Karicher") was and is a member of the Committee and/or GGNSC and a fiduciary of the Plan.

19.    At all relevant times, Defendant Larry Deans was a member of the Investment Committee and a fiduciary of the Plan.

20.     At all relevant times, Defendant John Arena was a member of the Investment Committee and a fiduciary of the Plan.

21.     At all relevant times, Defendant Pamela Daniels was a member of the Investment Committee and a fiduciary of the Plan.

22.     At all relevant times, Defendant Richard Skelly was a member of the Investment Committee and a fiduciary of the Plan.

23.     At all relevant times, Defendant Dana Sauls was a member of the Investment Committee and a fiduciary of the Plan.

24.     At all relevant times, Defendant Matthew MacGregor was a member of the Investment Committee and a fiduciary of the Plan.

25.     At all relevant times, Defendant Darren Burgess was and is a member of the Investment Committee and a fiduciary of the Plan.

26.     At all relevant times, Defendant Teri Burt was a member of the Investment Committee and a fiduciary of the Plan.

27.     At all relevant times, Defendant Elizabeth Ogdon was and is a member of the Investment Committee and a fiduciary of the Plan.

28.     At all relevant times, Defendant Amy Brantley was and is a member of the Investment Committee and a fiduciary of the Plan.

29.     At all relevant times, Defendant Norman Michael ("Mike") Morton was and is a member of the Investment Committee and a fiduciary of the Plan.

30.     At all relevant times, Defendant Ann Truitt was and is a member of the Investment Committee and a fiduciary of the Plan.

**31.**     Plaintiffs are informed and believe that Defendant Beverly is a Delaware corporation qualified to do business in Massachusetts with its principal executive offices in Fort Smith, Arkansas.

**32.**     On information and belief Plaintiffs allege that Beverly, the Investment Committee and each of the individual Defendants (collectively, the "Fiduciary Defendants") are and were each

1 fiduciaries of the Plan and are legally responsible for the occurrences herein alleged, during the
2 periods they served and/or continue to serve as fiduciaries to the Plan.

3 **FACTUAL BACKGROUND**

4 **A.    The Terms of the Plan Prior to July 2006**

5 33.    Defendants established the Plan to provide retirement benefits to employees of
6 Beverly and its subsidiaries Aedon Staffing, Aegis Therapies, Asera Care, Beverly Healthcare, and
7 Ceres Purchasing Solutions.

8 34.    On or about July 1, 1996, Beverly entered into a Pension Services Agreement with
9 Diversified to provide consulting, testing, recordkeeping, and communication services for the Plan.
10 Diversified is a provider of recordkeeping and investment management services for retirement
11 plans.  Diversified was and is located in Purchase, New York.  Diversified was a fiduciary of the
12 Plan.

13 35.    The named trustee of the Plan was Investor Bank & Trust Company, located in
14 Boston, Massachusetts.

15 36.    Prior to July 2006, the terms of the Plan provided that employees could contribute
16 from 1% to 50% of their pre-tax compensation.  In its discretion, Beverly could match up to 6% of
17 the employee's base pay on the last day of every plan year.  Participants in the Plan were permitted
18 to invest in any Plan funds; however, if a participant did not elect a fund, the default fund was the
19 Fixed Interest Fund (also known as the Stable Value Fund).

20 37.    According to the Plan's Summary Plan Description ("SPD"), the investment options
21 provided by the Plan were designed to provide a wide variety of options, ranging from relatively
22 low risk and low long-term earning potential to higher risk and higher long-term earning potential.
23 Emphasizing safety and low risk, the SPD noted:

24 If you need more time to study the investment options in depth, you can
simply invest your money in the Fixed Interest Fund [also called the Stable
25 Value Fund] (a relatively safe and flexible choice).

26 38.    The Stable Value Fund was allegedly designed to preserve principal and was the
27 safest of the investment options, attracting those participants who desired to ensure that principal
28 would be protected.

39.     The Plan provided participants with the use of the Diversified website to assist participants manage their accounts.

40.     The SPD noted that many of the expenses incurred by the Plan were paid by Beverly, but participants paid the loan initiation fee of $75 and the investment fund's management fee (which was charged to the assets of each fund).  The SPD provided that expenses allocable specifically to an individual participant (such as QDRO) could be charged to the participant's plan account.  The SPD was silent with respect to any possible market value adjustments relating to the investment options and how any such market value adjustments would be allocated to the individual plan participants.  It was also silent as to revenue sharing payments.

**B.     Stephens Charges Excessive Fees to the Plan**

41.     In or around August or September 2008, Defendants produced documents that revealed to Plaintiffs for the first time that Defendants had caused the Plan to pay Stephens, Inc. ("Stephens") roughly $1 million for unspecified "services" that Defendants cannot identify. Defendants failed to identify these payments in the IRS Form 5500's filed by the Plan for each year in which Stephens received compensation, and they were otherwise concealed from Plaintiffs.  On information and belief, such payments exceeded the value of any "services" that Stephens allegedly provided to the Plan.

**C.     Diversified Charges Excessive Fees to the Plan**

42.     Despite Defendants' fiduciary duty to monitor the Plan's service providers, on information and belief, Defendants failed to do so, during at least the period of 1996 though August 2004.

43.     On information and belief, Defendants had no Investment Committee to monitor the Plan's service providers until such a committee was formed in or around August 2004.

44.     Diversified provided services to the Plan from 1996 through 2006.  Diversified charged the Plan very high fees and provided Plan members with an inadequate selection of underperforming funds in which to place their life savings.

45.     Documents heretofore concealed by Defendants and their agents reveal that an analysis of Diversified's performance for 2002 through 2005 stated that "the Plan scored

significantly below average in all of the components except for relative contributions," including 31.1% for "benefit adequacy." In comparing Diversified to other service providers over this period, the consultant noted, among other things:

- Highest fees

- Lowest scores in administration and investments

- Assets not invested on day of receipt are returned

- Charge for locating missing participants

46.    Furthermore, Diversified entered into side deals with the mutual funds that it offered to Plan members, whereby those mutual funds would kick back "revenue sharing" payments to Diversified, in exchange for Diversified's placing the mutual funds on the menu of investment opportunities that Diversified presented to Plan members. These "revenue sharing" payments were not disclosed in Defendants' Form 5500's as compensation paid to Plan service providers. Defendants knew or should have known of these illegal practices and made no effort to stop them or disclose them to Plan members.

47.    In or around 2003, Beverly began soliciting bids to evaluate whether to replace Diversified. By approximately May 2004, Beverly had received several proposals to replace Diversified and to change the investment menu offered by the Plan. Yet Beverly still did not demand that Diversified reduce its fees, comply with ERISA's prohibited transaction rules, modify its investment menu to provide prudent investment choices, replace Diversified, or take any steps to avoid a "market value adjustment" penalty to the Stable Value Fund in the event Diversified were replaced and it became necessary to liquidate the Stable Value Fund. Beverly and its agents concealed the foregoing material facts from Plan participants.

48.    In or around May 2004, the consulting firm Watson Wyatt submitted a proposal to Beverly to help search for a vendor to replace Diversified. Beverly, however, did not retain Watson Wyatt until in or around March 2005.

49.    Watson Wyatt advised Beverly that the fees charged by Diversified were "very high" and recommended replacement of virtually every one of the investment options Diversified offered to Plan members. Nonetheless, Beverly failed to replace the underperforming investment

1    options or negotiate lower fees and/or better investment options.  On information and belief,

2    Defendants never made any effort to obtain disgorgement of the money received by Diversified in

3    violation of ERISA or to recoup the losses that Diversified caused the Plan and never revealed

4    these losses to Plan participants – even when they asked.

5    **D.    July 2006 – The Plan Changes Service Providers from Diversified to Fidelity**

6    **and Liquidates the Stable Value Fund**

7    50.    On or about August 16, 2005, Beverly entered into a merger agreement with Pearl

8    Senior Care, Inc. pursuant to which a wholly-owned subsidiary of PSC merged into Beverly

9    effective March 14, 2006.

10    51.    On or about November 14, 2005, the Investment Committee decided to recommend

11    switching service providers from Diversified to Fidelity.  On information and belief, the Investment

12    Committee did not consider the market value adjustment as part of this decision or remove the

13    Stable Value Fund as the Plan's default investment option.

14    52.    Defendants' witness designated as the most knowledgeable person about the market

15    value adjustment pursuant to FRCP 30(b)(6) testified that he was unaware of the market value

16    adjustment prior to the time the Investment Committee had decided to switch to Fidelity.  He

17    further acknowledged that nothing prevented Plan participants from transferring their investments

18    from the Stable Value Fund to an alternative investment offered by the Plan, without penalty, prior

19    to the termination of the Stable Value Fund.  Similarly, Defendants' most knowledgeable witness

20    has testified that nothing prevented the Plan's fiduciaries from moving a portion of Plan

21    participants' investments in the Stable Value Fund, without penalty, prior to the liquidation of the

22    Stable Value Fund, thereby reducing the Market Value Adjustment by hundreds of thousands of

23    dollars.  But Defendants inexplicably did not do so.

24    53.    On or about May 4, 2006, Defendant Karicher sent a letter to Plan participants

25    announcing changes to the Plan and information relating to the transition from Diversified to

26    Fidelity.  The letter did not disclose that the Plan would suffer losses as a result of a market value

27    adjustment to the Stable Value Fund.

28

54.     On or about June 19, 2006, in connection with the merger, the Beverly Board of Directors authorized the officers of Beverly to amend the Plan as they deemed necessary to effectuate the merger, and to appoint Golden Gate National Senior Care Administrative Services, LLC ("GGNSC") as the Plan Administrator of the Plan.  The amendments were deemed effective as of the closing date of the merger or March 14, 2006.

55.     The amendments to the Plan made by Beverly included:

1)     the deletion of the Beverly Stable Value Fund as the Plan's default investment;

2)     the revision of section 7.07 of the Plan to remove the Corporation Stock Fund as one of the Investment Funds available under the Plan and to direct any merger consideration received by a participant's individual account to be deposited in the Stable Value Fund as soon as administratively feasible following the merger; and

3)     the term "Plan Administration Committee" was replaced with "Golden Gate National Senior Care Administrative Services, LLC."

56.     In June 2006, Beverly began to implement its decision to change service providers from Diversified to Fidelity, amend the Plan, and revamp the Plan's investment alternatives.  In June, 2006, Beverly published a guide entitled, "a change for the better" ("Guide"), describing the process by which the Plan would transfer the assets from Diversified to Fidelity and to map the assets of the Plan to the new investment alternatives selected by Defendants.  To transfer the assets from June 27, 2006 to July 23, 2006, the Plan implemented a blackout period during which participants were unable to direct or diversify the assets held in their 401(k) accounts.

57.     On July 10, 2006, the Plan's investments were transferred automatically from Diversified to the investment options at Fidelity.  Participants in the Plan had no discretion or input with respect to the decision to liquidate the Stable Value Fund, the selection of investment options offered by Fidelity, or how the Diversified investments would be mapped to the new Fidelity investments.  For those investments in the Beverly Stable Value Fund, Defendants caused the assets to be transferred to a Fidelity target fund based on the age of the participant.

58.     The Guide noted that the transfer of assets depended upon the timely liquidation of assets from Diversified.  The Guide further disclosed the market value adjustment to the Plan participants for the first time:

> The Beverly Stable Value Fund was a separate account comprising a bond portfolio managed for a three-year contract duration. Duration estimates how much a bond's price fluctuates with changes in comparable interest rates. Other factors can also influence a bond fund's performance and share price. The declared rate at any time represents the yield on the portfolio net of contractual expenses, with gains or losses amortized over a three year duration of the bond portfolio. Upon transition, the bond portfolio will be liquidated, which will generate a Market Value Adjustment (MVA), resulting in a loss due to current market trends.

59.     On July 10, 2006, Beverly also published a new SPD describing the Plan and its providers, noting that Beverly remained the Plan Sponsor, but GGNSC Administrative Services LLC became the new Plan Administrator.

60.     On or about July 11, 2006, Defendant Karicher, sent an email to all Beverly employees announcing the completion of the transition of the 401(k) SavingsPlus Plan to Fidelity along with a Fidelity Transition Brochure describing the changes to the Plan.

61.     On or about August 11, 2006, Defendant Karicher sent a letter to Plan participants who were affected by the market value adjustment concerning "Information Regarding the Beverly Enterprises, Inc. 401(k) SavingsPlus Plan Liquidation of the Fixed Interest Fund (also called the Beverly Stable Value Fund) and Market Value Adjustment." In this letter, Karicher described the market value adjustment as a "plan service fee" that would appear on participants' final Diversified statement and stated that the entire Stable Value Fund had to be liquidated and converted to cash upon transition of plan assets to Fidelity. Karicher also claimed that Beverly made "every reasonable effort to minimize the impact of the transition on all of the participants by communicating well in advance and working directly with Diversified and Fidelity investments to ensure a smooth transition." No information was provided regarding what, if anything, Defendants did to evaluate whether the purported beneficial changes in the Plan could have been achieved at Diversified, how the transition to Fidelity resulted in reduced Plan expenses, or what efforts, if any Defendants made to minimize the amount of the market value adjustment incurred by the Plan.

62.     Under the amended Plan, Fidelity Management Trust Company ("FMTC") replaced Investment Bank & Trust Company as the trustee. FMTC is located in Boston, Massachusetts.

63.     The Market Value Adjustment penalty that Karicher described as a "plan service fee" was imposed exclusively on Plan members, such as Plaintiffs, who were invested in the Stable Value Fund at the time that fund was liquidated.

64.     The Stable Value Fund provided that the principal and accumulated interest of the investors were guaranteed, and that the investments would earn credited interest as well. However, when Defendants liquidated the Stable Value Fund, Defendants mapped participants' investments to Fidelity funds that did not guarantee principal or accumulated interest. As a result, the Plan has suffered millions of dollars in additional losses in principal that would not have occurred but for Defendants' imprudent decision to liquidate the Stable Value Fund and unilaterally map the funds to investment options that exposed participants to significantly greater risks.

65.     Plaintiffs are informed and believe and allege thereon that Defendants did not evaluate how to mitigate the losses caused to the Plan as a result of the market value adjustment to the Stable Value Fund.

66.     The Investment Committee minutes and the testimony of Defendants' most knowledgeable witness show that even after replacing Diversified, Defendants made no effort to evaluate potential claims that the Plan had against service providers that had participated in prohibited transactions involving Plan assets. Furthermore, Defendants failed to pursue claims against prior fiduciaries, such as Diversified and Stephens, to recoup the losses that Diversified, Stephens, and others had caused to the Plan or to pursue claims against those responsible entities for violations of ERISA. Nor did they disclose any of the foregoing conduct to Plan participants.

67.     Beginning in 2006, Plaintiffs asked Defendants and their agents to provide basic information concerning the Plan, the Stable Value Fund and the Market Value Adjustment. In responses, Defendants repeatedly promised to do so. These promises were false and made with intent to mislead Plaintiffs; thereafter, Defendants made no effort to locate all relevant materials, and did not provide any materials whatsoever to Plaintiffs until after the initiation of discovery in this litigation.

**E.     Fidelity**

68.     Fidelity was and is a fiduciary to the Plan.

1    69.    Notwithstanding Defendants' claim that Fidelity was the "best" choice for Plan

2    members, on information and belief, Fidelity's fees were and are almost as high as those charged

3    by Diversified.

4    70.    Like Diversified's investments, Fidelity's investments also have underperformed

5    their benchmarks.  In fact, the funds offered by Fidelity were speculative and untested.

6    71.    Fidelity (like Diversified) receives improper "revenue sharing" kickbacks from the

7    mutual funds it makes available to Plan participants in violation of ERISA.

8    72.    Thus, despite the change of providers, the Plan suffered and continues to suffer

9    unnecessary losses due to Defendants' fiduciary breaches, and Defendants have made no effort to

10   remedy these problems or to disclose them to Plan members.

11   **F.    Plaintiff Lois Katziff**

12   73.    Plaintiff Lois Katziff has been a Plan participant for almost 20 years.  Prior to the

13   transition from DIA to Fidelity, Ms. Katziff had 100% of her assets in the Plan in the Plan's Stable

14   Value Fund.  On July 7, 2006, at the time of the transition to Fidelity, Ms. Katziff had $135,200.21

15   in the Stable Value Fund.

16   74.    On or about July 7, 2006, the Stable Value Fund was liquidated and Defendants

17   allocated a Plan Service Fee in the amount of $4,824.96 to Ms. Katziff's account.

18   **G.    Plaintiff David Richards**

19   75.    Plaintiff David Richards has been a Plan participant for approximately 34 years.

20   Prior to the transition from DIA to Fidelity, Mr. Richards had 100% of his 401(k) Plan funds

21   invested in the Plan's Stable Value Fund.  On or about July 7, 2006, Mr. Richards had $217.413.48

22   in the Stable Value Fund.

23   76.    On or about July 7, 2006, the Stable Value Fund was liquidated and Defendants

24   allocated a Plan Service Fee in the amount of $7,758.99 to Mr. Richards' account.

25   **H.    Plaintiff Carolyn Shapiro**

26   77.    Plaintiff Carolyn Shapiro was a Plan participant for approximately 18 years.  Prior

27   to the transition from DIA to Fidelity, Plaintiff Carolyn Shapiro had 100% of her 401(k) Plan funds

28

invested in the Plan's Stable Value Fund. On or about July 7, 2006, Ms. Shapiro had $46,763.57 in the Stable Value Fund.

78.    On or about July 7, 2006, the Stable Value Fund was liquidated and Defendants allocated a Plan Service Fee in the amount of $1,644.05 to Ms. Shapiro's account.

## CLASS ACTION ALLEGATIONS

79.    This action is brought as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the following individuals (the "Class"):

> All participants and beneficiaries of the Plan from 1996 through the present, excluding any defendant in this action.

80.    The Class is composed of individuals in numerous and various locations in Massachusetts and throughout the United States.

81.    The number of Class members is so large that the joinder of all its members is impracticable, satisfying the requirements of Fed. R. Civ. P. 23(a)(1). The exact number of Class members can be determined from information in the possession and control of the Defendants, but on information and belief Plaintiffs allege that the number of class members is in the thousands.

82.    Plaintiffs' claims are typical of the claims of the members of the Class, satisfying the requirements of Fed. R. Civ. P. 23(a)(3).

83.    Plaintiffs are adequate representatives of the Class. Plaintiffs will fairly and adequately protect the interest of the Class, satisfying the requirements of Fed. R. Civ. P. 23(a)(4).

84.    Plaintiffs have retained competent counsel, experienced in class actions and ERISA litigation and intend to prosecute this action vigorously.

85.    Plaintiffs' interests are not antagonistic to or in conflict with the interests Plaintiffs seek to represent as Class representatives.

86.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Requiring Class members to pursue their claims individually would invite a host of separate suits, with concomitant duplication of costs, attorneys fees, and demands on court resources. Furthermore, as the damages suffered by the individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for the members of the Class individually to seek redress of the wrongs perpetrated

15

by Defendants. Plaintiffs know of no difficulty that could be encountered in the management of this litigation that would preclude its maintenance as a class action.

87.     There exist numerous common issues of law and fact in this matter within the meaning of Fed. R. Civ. P. 23(a)(2) and the same predominate over questions affecting only individual members within the meaning of Fed. R. Civ. P. 23(b)(1)(B), (b)(2), and (b)(3). These issues include, without limitation:

a)      Whether Defendants violated and continue to violate ERISA section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), which requires a fiduciary to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries of the plan; and

b)      Whether Defendants violated and continue to violate ERISA section 404(a)(1)(B) [29 U.S.C. § 1104(a)(1)(B)] which requires Defendants, and each of them, to prudently manage the investments of the Plan.

c)      Whether Stephens charged the Plan excessive fees.

d)      Whether Diversified charged the Plan excessive fees.

e)      Whether Diversified engaged in illegal "revenue sharing" kickbacks.

f)      Whether Defendants disclosed any of Diversified's excessive fees and kickbacks to Plan members.

g)      Whether Defendants did anything to remedy any of the foregoing conduct.

h)      Whether Fidelity charged the Plan excessive fees.

i)      Where Fidelity engaged in illegal "revenue sharing" kickbacks.

j)      Whether Defendants disclosed any of the Fidelity's excessive fees and kickbacks to Plan members.

k)      Whether Defendants did anything to remedy any of the foregoing conduct.

## FIRST CLAIM FOR RELIEF
### (Breach of Fiduciary Duty – Market Value Adjustment)

88.     Plaintiffs reallege and incorporate by reference all of the preceding paragraphs, as though fully set forth herein.

89.     At all relevant times, Defendants are and were fiduciaries with respect to the Plan. As fiduciaries they were required, inter alia, to select prudent investment options, to take all steps

1  necessary to protect the Plan's assets, and to fully, completely, and truthfully inform Plan

2  participants of all material factors that could impact their investment choices.

3        90.    Defendants breached their fiduciary duties to Plaintiffs and the Class in violation of

4  ERISA sections 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and 404(a)(1)(B), by causing the

5  Plan to incur an unnecessary and substantial liquidation fees associated with the transfer of assets

6  from Diversified to Fidelity, while failing to provide Plan participants with material facts necessary

7  to avoid such penalties and by failing to take reasonable actions to avoid incurring the penalty.  By

8  causing the Plan to switch service providers in June 2006, Defendants unnecessarily caused the

9  Plan to incur substantial charges to the Stable Value Fund – an investment alternative designed to

10 provide participants with a safe and secure investment, including a guarantee of principal and

11 accumulated interest.  Defendants could have prevented this substantial loss to the Plan in

12 numerous ways, including without limitation retaining Diversified as a service provider and

13 continuing the Stable Value Fund, disclosing the potential of a market value adjustment to Plan

14 members, allowing participants to have the ability to transfer assets out of the Stable Value Fund

15 prior to the market value adjustment, and/or transferring assets out of the Stable Value Fund.

16       91.    As a direct and proximate result of Defendants' conduct, the Plan suffered losses in

17 excess of $2 million.

### SECOND CLAIM FOR RELIEF
#### (Breach of Fiduciary Duty – Failure to Prudently and Loyally Manage Plan Assets)

18
19
20       92.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs, as

21 though fully set forth herein.

22       93.    Defendants are fiduciaries with respect to the Plan.  As fiduciaries they are required

23 at all times to select prudent investment options, defray the reasonable expenses of the Plan,

24 eliminate imprudent investment options, evaluate the merits of the Plan's investments on an

25 ongoing basis, and take all steps necessary to ensure that the Plan's assets are prudently invested.

26       94.    Defendants breached their duties by inter alia, failing to implement prudent

27 procedures for evaluating, monitoring, and selecting Plan investment options, maintaining Plan

28 investment options that they knew or should have known were unreasonably expensive when

compared to readily available, less expensive comparable and better performing funds, selecting

and continuing to offer investment options that underperformed, employing and continuing to employ Stephens as a service provider, when it charged excessive and unreasonable fees to the Plan, employing and continuing to employ Diversified as a service provider knowing that Diversified received "revenue sharing" kickbacks from the mutual funds and the Stable Value Fund that it offered, which were not related to reasonable compensation for Diversified's services, and which resulted in prohibited transactions under ERISA § 406(a) and (b), 29 U.S.C. § 1106, taking Plan assets safely invested in the Stable Value Fund and "mapping" them into Fidelity funds that did not similarly guarantee the return of principal and accumulated interest, employing and continuing to employ Fidelity as a service provider when it charged excessive and unreasonable fees to the Plan for untested, underperforming funds when less expensive, better performing funds were readily available, and not pursuing legal remedies against Plan fiduciaries, including without limitation Stephens, Diversified, and Fidelity.

95.    Defendants failed to conduct an appropriate investigation of the merits of Plan investment options and the ready availability of better performing, less risky and/or less expensive options. Such an investigation would have revealed to a reasonably prudent fiduciary that Plan members were needlessly losing millions of dollars from their retirement savings.

96.    On information and belief, Defendants failed to make any independent assessment of the reasonableness of any advice they may have received related to their fiduciary decision-making, including without limitation their decisions to incur fees, to provide investment options to Plan participants, to select and/or switch service providers, and to seek legal recourse against responsible parties. On information and belief, Defendants never made any effort to verify the reasonableness of the fees charged to the Plan by comparing the actual costs to perform the services against the fees charged.

97.    Defendants never took any steps to recoup any of the Plan's losses described above, including without limitation bringing legal action against Plan fiduciaries and/or service providers to recover excessive fees and expenses and to disgorge their illegal and/or ill-gotten gains, such as "revenue sharing" kickbacks or the MVA.

98.    As a direct and proximate result of Defendants' conduct, the Plan and its members suffered losses.

99.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), Defendants are required to restore the losses to the Plan caused by their breaches of fiduciary duty and to provide all other equitable relief as appropriate.

### THIRD CLAIM FOR RELIEF
#### (Breach of Fiduciary Duty – Failure to Monitor Fiduciaries)

100.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs, as though fully set forth herein.

101.    Defendants' fiduciary responsibilities included the duty to appoint, remove, and monitor the performance of the Plan's fiduciaries.  Defendants breached those duties by failing to monitor their service providers and standing idly by while the Plan suffered enormous losses, and failing to remove service providers who were causing damage to the Plan.

102.    As a direct and proximate result of Defendants' conduct, Plan members suffered losses.

### FOURTH CLAIM FOR RELIEF
#### (Breach of Fiduciary Duty – Failure to Provide Complete and Accurate Information to Plan Participants)

103.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs, as though fully set forth herein.

104.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to Plan participants, not to mislead them regarding the Plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan, so that they may make informed decisions about their investment options.

105.    Defendants breached this duty by failing to provide complete and accurate information to Plan participants about the possibility that the Stable Value Fund could incur a "market value adjustment" penalty and how to avoid such a penalty.

106.    Defendants further breached this duty by failing to provide complete and accurate information to Plan participants regarding the following, all of which is critical to Plan participants being able to make informed decisions about their accounts:

a.    Stephens charged excessive fees and expenses to the Plan that exceeded the value of any services performed by Stephens;

b.    Diversified and/or Fidelity charged excessive fees and expenses that were substantially higher than the fees and expenses charged by readily available comparable fund options

c.    The performance of the investment options offered by Diversified and/or Fidelity was inferior to the performance of readily available comparable funds that charged substantially lower fees and expenses

d.    The excessive fees and expenses charged by Stephens, Diversified and/or Fidelity substantially reduced the Plan members' retirement savings because such fees and expenses were paid from Plan assets

e.    Defendants were making no effort to monitor Stephens and/or Diversified's excessive fees and subpar investment performance

f.    Defendants did not evaluate Stephens and/or Diversified's fees and investment options on an ongoing basis

g.    Each of the investment options offered by Diversified and/or Fidelity paid "revenue sharing" kickbacks to Diversified

h.    The "revenue sharing" kickbacks received by Diversified were kept by Diversified instead paid back to the Plan

107.    Defendants did not disclose the amount of revenue sharing kickbacks that Diversified and/or Fidelity received.

108.    Defendants did not disclose that participants would suffer a liquidation fee in the event of a change in service providers and the required liquidation of the Stable Value Fund.

109.    Defendants' omissions, incomplete statements and misrepresentations were uniform as to the entire Plan.

110.    As a direct and proximate result of Defendants' conduct, Plan members suffered losses.

111.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), Defendants are required to restore the losses to the Plan caused by their breaches of fiduciary duty and to provide all other equitable relief as appropriate.

**FIFTH CLAIM FOR RELIEF**
**(Prohibited Transactions)**

112.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs, as though fully set forth herein.

113.    Defendants are fiduciaries with respect to the Plan. As fiduciaries they are bound by the prohibited transaction provisions of ERISA § 406(a) and (b), 29 U.S.C. § 1106. These provisions prohibit, inter alia, causing the Plan to enter into transactions with parties-in-interest and/or fiduciaries.

114.    Defendants engaged in transactions prohibited by ERISA § 406(a)(1)(C) by causing the Plan to engage in transactions that they knew or should have known constitute a direct or indirect furnishing of services between the Plan and a party-in-interest, including without limitation transactions with Stephens, Diversified and Fidelity. For example, Defendants caused the Plan to enter contracts and other arrangements with Diversified and/or Fidelity, parties-in-interest, through which Diversified and/or Fidelity obtained "revenue sharing" from mutual funds and other Plan investment options ("Plan Investment Options"). These revenue sharing payments were not tied to the value of any services provided; they were simply a quid pro quo paid by the Plan Investment Options in exchange for Fidelity and/or Diversified making the Plan Investment Options available to Plan members.

115.    Defendants engaged in transactions prohibited by ERISA § 406(a)(1)(D) by causing the Plan to engage in transactions that they knew or should have known constituted a direct or indirect use by or for the benefit of a party-in-interest, of any assets of the Plan. For example, Defendants caused the Plan to enter contracts and other arrangements with Diversified and/or Fidelity, parties-in-interest, through which Diversified and/or Fidelity obtained "revenue sharing" from Plan Investment Options. Defendants knew or should have known that the Plan's contracts

21

with Diversified and/or Fidelity resulted in prohibited transactions.  On information and belief, only Plan Investment Options that paid "revenue sharing" kickbacks were made available to Plan participants, rather than less expensive, better performing funds.

116.    As a direct and proximate result of Defendants' conduct, Plan members suffered losses.

## SIXTH CLAIM FOR RELIEF
### (Co-Fiduciary Liability)

117.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs, as though fully set forth herein.

118.    ERISA section 409, 29 U.S.C. § 1109, provides that each Defendant is personally liable for damages to the Plans and is subject to such other equitable and remedial relief as the court may order.

119.    ERISA section 405, 29 U.S.C. § 1105, imposes liability on a fiduciary for another fiduciary's breach of fiduciary duty, if he or she knows of such a breach and fails to remedy, or if he or she knowingly participates in a breach, or if he or she enables a breach.  Defendants are liable as co-fiduciaries for each of these three separate reasons because, inter alia, they knew that there were less expensive service providers and better comparable funds in the marketplace, they knew that Diversified and Fidelity were receiving "revenue sharing" kickbacks – and indeed agreed that Diversified and Fidelity need not fully and fairly disclose all of their revenue sharing payments to Plaintiffs – and they failed to stop and enabled such breaches.

120.    Defendants, and each of them, have violated and continue to violate ERISA section 405 to the detriment of the Plan, Plaintiffs, and Class.

121.    As a direct and proximate result of Defendants' conduct, Plan members suffered losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for relief as follows:

A.    That judgment be entered against Defendants, and each of them, in favor of Plaintiffs and the Class;

1      B.      That judgment be entered for Plaintiffs and the Class in an amount to be proven at

2    trial, including all losses suffered by the Plan;

3      C.      An order awarding attorney's fees pursuant to ERISA § 502(g) and the common

4    fund doctrine;

5      D.      An order enjoining Defendants from any further violation of their fiduciary duties

6    under ERISA;

7      E.      An order awarding costs pursuant to ERISA § 502(g) and all other applicable laws

8    and regulations;

9      F.      All other relief that the Court may deem just and proper.

10   Dated: December 2, 2008                          LINER YANKELEVITZ
                                                       SUNSHINE & REGENSTREIF LLP
11
                                                       ROSENFELD & RAFIK, PC
12
                                                       /s/_____
13                                                     Ronald S. Kravitz

14                                                     Ronald S. Kravitz
                                                       Matthew Borden
15                                                     Liner Yankelevitz Sunshine & Regenstreif
                                                       199 Fremont Street 20th Floor
16                                                     San Francisco, CA 94105-2255
                                                       Telephone: (415) 489-7700
17                                                     Facsimile: (415) 489-7701

18   and

19                                                     Mala M. Rafik
20                                                     Rosenfeld & Rafik, PC
                                                       44 School Street Suite 410
21                                                     Boston, MA 02108
                                                       Telephone: 617-723-7470
22                                                     Fax: 617-227-2843

23
                                                       Counsel for Plaintiffs
24                                                     LOIS KATZIFF, DAVID RICHARDS
                                                       and CAROLYN SHAPIRO
25

26

27

28

23